IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

RYAN PADILLA MANGUAL,

Plaintiff,

v.

PAVIA HOSPITAL, et al,

Defendants.

CIVIL NO.  06-1115 (FAB)

## REPORT AND RECOMMENDATION

## INTRODUCTION

On January 30, 2006, plaintiff Ryan Padilla-Mangual ("Padilla") brought suit pursuant to the diversity statute, 28 U.S.C. §1332, for damages under Puerto Rico's general tort statute, Civil Code Article 1802, P.R. Laws Ann. tit. 31 §5141 (Docket No. 1). On July 7, 2006, defendant Dr. Miguel de la Cruz Castellanos ("Dr. de la Cruz") moved the Court to dismiss the complaint for lack of jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1) **(**Docket No. 7). On August 22, 2006, Padilla opposed the motion (Docket No. 19). On October 3, 2006, defendant Pavia Hospital (the "Hospital") moved for summary judgment on Padilla's claims, arguing the Court lacked jurisdiction due to a lack of diversity of citizenship between the parties (Docket No. 29). On November 8, 2006, Padilla opposed the motion for summary judgment. (Docket No. 43).

On February 5, 2007, the District Court granted Dr. de la Cruz's motion to dismiss and the Hospital's motion for summary judgment and dismissed the case, without holding an evidentiary hearing.  (Docket No. 61).  Padilla timely appealed.

Ryan Padilla Mangual v. Pavia Hospital, et al
Civil No. 06-1115 (FAB)
Report and Recommendation
Page 2

On February 14, 2008, the United States Court of Appeals reversed and remanded the case for an evidentiary hearing on the question of diversity of citizenship. Padilla-Mangual v. Pavía Hospital, No, 07-1447. The Court of Appeals indicted "the best approach is for the district court to take a fresh look at all the evidence submitted and conduct an evidentiary hearing to assess the credibility of the declarants." Id, p. 8, fn. 7. The Court of Appeals also indicated that "[i]n conducting a jurisdictional inquiry, the court enjoys broad authority to order discovery, consider extrinsic evidence, hold an evidentiary hearing, and hear testimony in order to determine its own jurisdiction." Id, p. 12.

On March 18, 2008, the presiding District Judge referred this case to this Magistrate Judge to hold the evidentiary hearing ordered by the Court of Appeals and to submit a report and recommendation. The referral Order stated that, since the Court of Appeals requested the credibility of declarants be assessed, at the very least those persons who submitted statements in support of and against jurisdiction should testify at the hearing including plaintiff Padilla, his mother Nilda Mangual and his former counsel Antonio Bauzá-Torres. In addition, this Magistrate Judge was instructed to include in the report and recommendation an analysis of whether this court should abstain from deciding this case based on the abstention doctrine set forth in Colorado River Water Conservation Dist. v. United States, 424 U.S. 800 (1976). (Docket Nos. 76 and 77).[1]

---

[1] The undersigned respectfully understands there is no need to include a discussion in this report and recommendation of whether this court should abstain from deciding this case based on the abstention doctrine set forth in Colorado River. The similar case filed in state court, which was originally dismissed with prejudice, was appealed to the Puerto Rico Circuit Court of Appeals which reversed making the dismissal without prejudice. The decision of the Puerto Rico Circuit Court of Appeals was affirmed by the Puerto Rico Supreme Court by denying the certiorari filed. Thus, the dismissal of the state case stands as dismissed without prejudice. (See Docket No. 85). Thus, the analysis under Colorado River has become moot.

On March 18, 2008, a Status Conference was held by the presiding District Judge in which the parties informed that a similar case was filed in state court by plaintiff Padilla and his mother and the case was dismissed with prejudice, but it was on appeal. (Docket No. 78).

On April 14, 2008, a Status Conference was held by the undersigned in which the parties informed that on April 3, 2008 the Circuit Court of Appeals for the Commonwealth of Puerto Rico revoked the decision of the lower state court which dismissed the case with prejudice. Thus, as the case stood then before the local courts, the state case was dismissed without prejudice. Counsel for defendants indicated they were evaluating whether they were going to appeal the decision of the Circuit Court of Appeals to the Supreme Court of the Commonwealth of Puerto Rico. Thus, the parties jointly requested that the evidentiary hearing referred by the Court be held in abeyance and that a further Status Conference during the month of May be set to discuss the status of the local case at that time and whether the evidentiary hearing would be necessary. (Docket No. 80).

On May 27, 2008, the parties agreed to vacate the Status Conference *sine die* pending the resolution by the Puerto Rico Supreme Court of the *certiorari* pending before said court. (Docket No. 84).

On September 26, 2008, plaintiff filed a motion informing the Court the *certiorari* was denied by the Puerto Rico Supreme Court. Thus, the dismissal of the case at the state level remained without prejudice. Plaintiff requested the scheduling of the evidentiary hearing. (Docket No. 85).

Ryan Padilla Mangual v. Pavia Hospital, et al
Civil No.  06-1115 (FAB)
Report and Recommendation
Page 4

On October 14, 2008, a Status Conference was held and the parties agreed the evidentiary hearing be held on January 12, 2009.  (Docket No. 87).

The evidentiary hearing was held on January 12, 13 and 16, 2009 and all the parties were represented by counsel of record.  The following persons testified on behalf of plaintiff: counsel Antonio Bauzá-Torres, plaintiff Padilla, Nicole Freire, Nilda Mangual, Modesto Meléndez -Mangual[2], Micely Peña-Fernández and Cigna Magali Cabrera-Torres.  (Docket Nos. 98, 99 and 100).  The parties presented several documents which were introduced into evidence.  (Docket No. 101).

## DISCUSSION

As courts of limited jurisdiction, federal courts have the duty to construe jurisdictional grants narrowly. *See e.g.*, <u>Alicea-Rivera v. SIMED</u>, 12 F.Supp.2d 243, 245 (D. Puerto Rico 1998).

Because federal courts have limited jurisdiction, the party asserting jurisdiction has the burden of demonstrating the existence of federal jurisdiction. *See* <u>Murphy v. United States</u>, 45 F.3d 520, 522 (1st Cir. 1995); <u>Droz Serrano v. Caribbean Records Inc</u>., 270 F.Supp. 2d 217 (D. Puerto Rico 2003). When deciding whether to dismiss a complaint for lack of subject matter jurisdiction, the Court "may consider whatever evidence has been submitted, such as . . . depositions and exhibits." *See* <u>Aversa v. United States</u>, 99 F.3d 1200, 1210 (1st Cir. 1996). When federal jurisdiction is premised on the diversity statute, courts must

---

[2] Counsel for plaintiff indicated María Casandra Fournier-Ferra was available to testify but her testimony would be cumulative to that of Modesto Meléndez-Mangual inasmuch as she was also a neighbor of plaintiff while he resided at Estancias de San Fernando.  As such, counsel for plaintiff proffered what her testimony would be and her testimony was not presented.  Counsel for defendants did not voice any objection.

determine whether complete diversity exists among all plaintiffs and all defendants. Casas
Office Machines v. Mita Copystar America, Inc., 42 F.3d 668, 673 (1st Cir. 1994).

   For purposes of diversity jurisdiction, citizenship usually is equated with domicile.
Valentín v. Hospital Bella Vista, 254 F.3d 358, 366 (1st Cir. 2001). A person is a citizen of
the state in which he is domiciled. Lundquist v. Precision Valley Aviation, Inc., 946 F.2d 8,
10 (1st Cir. 1991). Domicile generally requires two elements: (1) physical presence in a state,
and (2) the intent to remain there indefinitely. Valentín, 254 F.3d at 366. A person's
domicile is the "place where he has his true, fixed home and principal establishment, and
to which, whenever he is absent, he has the intention of returning." Id. (citing Rodríguez-
Díaz v. Sierra-Martínez, 853 F.2d 1027, 1029 (1st Cir. 1988)). The person is not required to
have the intention to stay there permanently, however. A plaintiff maintains his domicile
until it can be proven that he has changed it. Id. While a person may have more than one
residence, a person can have only one domicile. See Hawes v. Club Ecuestre El Comandante,
598 F.2d 698, 701 (1st Cir. 1979). To ascertain a person's domicile (particularly if there is
evidence that a party's domicile is unclear), the Court must focus on the party's intent.
Palermo v. Abrams, 62 F.Supp.2d 408, 410 (D. Puerto Rico 1999). The analysis calls for a
"totality of the evidence" approach, and no single factor is conclusive. Id. Courts must make
these determinations on a case-by-case basis. Id.

   Some of the factors traditionally considered when determining a party's domicile are:
(1) where the person exercises the right to vote; (2) the location of the person's real and
personal property; (3) the state issuing the person's driver's license; (4) where the person
maintains his bank accounts; (5) club or church membership; and (6) the person's place of

Ryan Padilla Mangual v. Pavia Hospital, et al
Civil No.  06-1115 (FAB)
Report and Recommendation
Page 6

employment. Palermo, 62 F.Supp.2d at 410 (citing Bank One, Texas, N.A. v. Montle, 964 F.2d 48, 50 (1st Cir. 1992)). "Statements of intent are accorded minimal weight measured against these objective factors." Alicea-Rivera v. SIMED,12 F.Supp.2d at 246. The determination of domicile is a mixed question of law and fact. Palermo, 62 F.Supp.2d at 410. Domicile is determined as of the time the suit is filed. Lundquist, 946 F.2d at 10, Valedón Martínez v. Hospital Presbiteriano de la Comunidad, Inc., 806 F.2d 1128, 1132 (1st Cir. 1986).

Defendants in this case have challenged federal jurisdiction claiming Padilla filed a complaint in state court in essence making the same allegations as in his federal complaint but alleging he is a resident of Puerto Rico. Padilla contended the allegations of residency contained in the state complaint were "clerical errors" and that he had, by December 31, 2004, permanently relocated to Florida.

Once jurisdiction is challenged, "the party invoking subject matter jurisdiction has the burden of proving by a preponderance of the evidence the facts supporting jurisdiction." Bank One, 964 F.2d at 50.

In order to establish that there is diversity of citizenship, Padilla must establish by preponderance of the evidence that as of January 30, 2006, the date he filed the complaint in federal court (Docket No. 1), he was domiciled in Florida. García Pérez v. Santaella, 364 F.3d 348, 351-52 (1st Cir. 2004).

After considering the testimonial and documentary evidence presented at the evidentiary hearing, and after assessing the credibility of the witnesses, and under the totality of the circumstances, this Magistrate Judge opines plaintiff Padilla has meet his

burden of establishing that, as of January 30, 2006 and until present, he has been domiciled in Jacksonville, Florida.  We explain.

The following facts, related to the jurisdictional issue and in pertinent part, are uncontested pursuant to the evidence presented at the evidentiary hearing:

1.  On August 22, 2005, attorney Bauzá-Torres filed in state court an original complaint in which his secretary inadvertently copied and pasted the address of the mother of plaintiff Padilla in Puerto Rico as Padilla's address.  The same error was committed in the amended complaint which was filed in state court on January 10, 2006.

2.  Attorney Bauzá-Torres testified plaintiff Padilla was a resident of Florida at the time he became his client. Attorney Bauzá-Torres explained Padilla went initially to Florida to seek medical treatment because he did not trust the physicians in Puerto Rico.  Once in Florida, Padilla  decided to stay there and became a citizen of Florida.

3.  Padilla met attorney Bauzá-Torres for the first time upon his arrival to Puerto Rico for this evidentiary hearing.

4.  On December 31, 2004, Padilla moved to Jacksonville, Florida to seek medical treatment.

5.  Padilla received treatment at the Mayo Clinic in Jacksonville, Florida for a period of time during the year 2005.  (Exhibit 3).

6.  The address Padilla provided at the Mayo Clinic was his mother's address in Carolina, Puerto Rico.  The reason for providing this address was for the

Mayo Clinic to send the bills to Padilla's mother who was in Puerto Rico in order for her to pay the deductibles not covered by the insurance carrier.

7.   On May 5, 2005, Padilla underwent a hip replacement surgery in the Mayo Clinic in Jacksonville, Florida.

8.   Padilla is medically and vocationally disabled.  (Exhibit A).

9.   Padilla received therapies in Jacksonville, Florida for two months after the hip replacement surgery.

10.   Once Padilla arrived in Jacksonville, Florida, he stayed the first two weeks at a Marriott Hotel and then resided at Villages of Bay Meadows in Jacksonville, Florida, with his mother and then girl friend Nicole Freire, for a period of time Padilla did not recall.

11.   While receiving treatment at the Mayo Clinic, Padilla resided at Villages of Deer Wood in Jacksonville, Florida, with his mother and Freire, for a period of time Padilla did not recall.

12.   After residing at Villages of Deer Wood, Padilla resided at Royal Oaks apartments in Jacksonville, Florida, with his mother and Freire, for a period of time Padilla did not recall.

13.   After residing at Royal Oaks apartments, Padilla resided at Auburn Glen apartments in Jacksonville, Florida, with Freire, for a period of time Padilla did not recall.

14.   After residing at Auburn Glen apartments, Padilla resided at Lakeside apartments in Jacksonville, Florida, with his mother.  This is the place where

Ryan Padilla Mangual v. Pavia Hospital, et al
Civil No.  06-1115 (FAB)
Report and Recommendation
Page 9

Padilla currently resides with Freire and their daughter.  Padilla has resided at this location for approximately 1 ½ years.

15.     From December 31, 2004 (date on which Padilla first moved to Florida) until the present, Padilla has never visited Puerto Rico until this time to attend the evidentiary hearing.

16.     After Padilla left to Jacksonville, Florida in December 31, 2004, he has not visited Puerto Rico because he has a phobia and panic to come to Puerto Rico due to his medical situation with the doctors and the hospital.  Padilla fears something may happen to him while in Puerto Rico.

17.     Padilla decided to stay in Florida after he finished his medical treatment there around July or August 2005.

18.     Padilla has a Duval County, Florida voter's registration card which was issued on December 6, 2006 which shows his former address at Auburn Glen apartments in Jacksonville, Florida. (Exhibit 1).

19.     Padilla decided to register to vote in Florida because he is a resident of Florida.

20.     Padilla has not worked after leaving to Florida because he does not feel mentally sane. Padilla suffers from depression and anxiety and he does not feel he is able to work like a normal person.[3]

21.     Padilla's mother and the mother of Freire paid all his bills in Florida.

---

[3] Padilla suffered during the evidentiary hearing  what seemed to be a panic attack during the cross-examination of his wife Freire.  Padilla complained of not been able to breath and was removed from the court room.  After a recess, Padilla felt better and decided to remain outside the court room until the conclusion of his wife's testimony.

22.   Padilla did not try to get a job the first year he was in Jacksonville, Florida because he was bed ridden due to the medical condition of his hip.  Padilla was in constant pain.

23.   Some time after the first year, Padilla attempted to work while in Jacksonville, Florida at the Discovery Channel store and Radio Shack but had to quit, after several months, due to his depression.

24.   In 2008, Padilla voted in the elections in Florida.

25.   Padilla owns furniture, clothing, jewelry and a pet which are all located in his apartment in Jacksonville, Florida.  The pet is a dog (named "Ruby") who was in Puerto Rico originally and Padilla requested it be taken to Jacksonville, Florida while he was residing in the first apartment.

26.   Dr. Merit is Padilla's psychiatrist in Jacksonville, Florida.

27.   All the apartments Padilla has resided over the years in Jacksonville, Florida have been leased.  All the apartments have been leased to Padilla's mother and/or Freire because Padilla did not have, and currently does not have, an income.

28.   Padilla has a driver's license from the State of Florida which was originally issued in January 20, 2005.  Padilla lost his driver's license and a duplicate was issued on December 6, 2006.  The address shown on the duplicate driver's license pertains to the apartment in Auburn Glenn in Jacksonville, Florida.  (Exhibit 2).  Padilla does not recall when he lost his driver's license.

29.    The driver's license which was submitted with plaintiff's appellate brief to the
Court of Appeals of the First Circuit on June 11, 2007 was a copy of the
original license not the duplicate.

30.    Padilla met Freire about four years ago in Puerto Rico while she was studying
at the Sacred Heart University.

31.    Freire moved with Padilla to Jacksonville, Florida when Padilla's  medical
situation with his hip started.

32.    On December 31, 2004, Padilla, Freire and Padilla's mother all traveled
together to Jacksonville, Florida.

33.    On February 2008, Padilla and Freire got married in their apartment in
Jacksonville, Florida.  They have a 10 months old baby girl who was born on
March 4, 2008 in Jacksonville, Florida.

34.    Nicole Freire met Padilla in college and dated for two months.  Padilla got
sick and she moved with him to Florida because the relationship was a
serious one and she did not want to leave him alone.

35.    Freire was the primary care taker of Padilla and accompanied him to his
treatment and therapies in Jacksonville, Florida.

36.    Padilla has a car in Jacksonville, Florida which is registered under his
mother's name because he could not buy the car due to the fact he has no
income because he does not work.

37.    From December 31, 2004 to January 31, 2006, Padilla did not belong to any
church, clubs or fraternal organizations because he was bed ridden.

38.   Padilla does not have any bank accounts in Florida nor in Puerto Rico.

39.   Padilla still has his electoral voting card from Puerto Rico.  (Exhibit B).
Padilla voted in Puerto Rico prior to moving to Jacksonville, Florida.

40.   Padilla did not vote in Puerto Rico during the 2008 elections because he was
in Florida.

41.   Padilla has not filed income tax returns in Florida.

42.   Padilla has never received and does not currently receive any kind of
assistance from the government of Puerto Rico.

43.   Padilla receives public assistance in Florida via Medicaid and food stamps for
his daughter.  Padilla has applied for Social Security benefits.

44.   Padilla's insurance carrier originally in 2006 was Blue Cross (see Exhibit C)
and then it changed to Medicaid in Florida.  Padilla does not recall the date
when the insurance carrier changed.

45.   The Mayo Clinic had the address of Padilla's insurance carrier.  Padilla stated
he does not know anything about the invoicing of the insurance carrier
because that situation was handled by his mother.

46.   All the apartment lease contracts, auto registration, and auto insurance from
2004 to present are not under Padilla's name.

47.   Padilla does not have an ATM card.

48.   Padilla does not have any credit cards.  Padilla only manages cash he receives
from his mother.

49.    Padilla does not have a telephone in his house, he has a cellular telephone.[4]

50.    Padilla receives mail in the box at the apartment complex where he resides in Lakeside apartments in Jacksonville, Florida.

51.    During the first year in Florida, Padilla had no daily activities, he stayed in bed with pain.  Padilla was depressed and aggressive.

52.    From July to December 2006, Freire moved to Puerto Rico because she could not deal with Padilla's depression.  Padilla never visited Freire in Puerto Rico.

53.    During the year 2006, Mangual moved back to Puerto Rico but she traveled constantly to Jacksonville, Florida to see her son.

54.    The neighbors of Mangual at Estancias de San Fernando in Carolina, Puerto Rico testified plaintiff Padilla does not reside in Puerto Rico since approximately 4 years ago because he moved to the United States.

55.    The neighbors at Estancias de San Fernando have not seen plaintiff Padilla since he moved to the United States in December 2004 until he now came to attend the evidentiary hearing.

56.    Cigna Magali Cabrera-Torres has known plaintiff's mother for about 30 years and they are friends.  Ms. Cabrera-Torres visited plaintiff Padilla in Jacksonville, Florida on 3 occasions when she went to visit her sons in Orlando, Florida in the year 2005.

---

[4] We are mindful that, due to the extensive use of cellular telephones, many people now a days do not have regular telephone lines in their houses.

57.     Ms. Cabrera-Torres visited plaintiff Padilla once in January 2005 (while Padilla was staying at a hotel) and twice in April 2005 around Holy Week (while Padilla was residing at a leased apartment).

58.     After Padilla finished his therapies two or three months after the surgery, his mother told him they had to return to Puerto Rico but Padilla refused. Padilla became aggressive and did not want to talk about the subject. Padilla was afraid of coming to Puerto Rico because he feared of getting sick again in Puerto Rico.

Based on the above factual scenario, and after assessing the credibility of the witnesses, Padilla has shown by preponderance of the evidence that he established his domicile in Florida since at least July 2005[5] after he finished his medical treatment.[6]

Padilla's testimony is unequivocal as to his desire and intent, since finishing his treatment in the Summer of 2005, to establish his domicile indefinitely in Florida.[7]  It is unrebutted Padilla has had continuous physical presence in Florida since December 31, 2004 while residing at different leased apartment complexes in Jacksonville, Florida. Evidence of this is the fact that, after he left to Florida to receive medical treatment in December 31, 2004, he has never traveled to Puerto Rico, with the exception of his recent

---

[5]   July 2005 is the approximate time on which Padilla finished his two months of therapies after his hip replacement surgery on May 5, 2005.

[6] The period of time here at issue is from December 31, 2004 (date on which Padilla went to Jacksonville, Florida) to January 30, 2006 (date of the filing of the complaint in federal court).

[7] Padilla's testimony as to his intent to remain in Florida was corroborated by the testimony of attorney Bauzá-Torres, Freire and Mangual.

Ryan Padilla Mangual v. Pavia Hospital, et al
Civil No.  06-1115 (FAB)
Report and Recommendation
Page 15

trip to attend the evidentiary hearing.  In fact, Padilla did not even visit Puerto Rico when

Freire, his then girl friend, moved back to Puerto Rico from July to December 2006.

Another clear evidence of Padilla's intent to remain in Florida is Padilla's early

request that his dog be taken to Florida.  Padilla's dog, that was originally in Puerto Rico,

was taken to Jacksonville upon Padilla's request during the first weeks he moved to Florida.

We also note all of the belongings of Padilla (furniture, clothing and vehicle) are in

Jacksonville, Florida.  Padilla has a Florida driver's license which was issued to him on

January 20, 2005.  Padilla is registered to vote in the State of Florida since December 6,

2006 and he voted in the 2008 general elections in Florida.[8]  Padilla did not vote in the

Puerto Rico general elections of 2008.

In addition, Padilla's intent to remain in Florida is also shown by his attempt to work

there.  The evidence shows Padilla made efforts to get a job in Jacksonville and in fact got

two different jobs in the area of Jacksonville, Florida  but had to quit due to his depression.

Furthermore, Padilla has never received any public assistance from the government

of Puerto Rico.  Nonetheless, Padilla has received and still receives public assistance from

the State of Florida via Medicaid and food stamps for his daughter.

In this particular case, some of the factors traditionally taken into account when

determining a person's domicile, if strictly applied, may seem to militate against Padilla's

---

[8]  Counsel for defendant argued Padilla's status as a voter in Puerto Rico is "active" pursuant to information obtained from the official website of the Puerto Rico Electoral Commission.  The fact that Padilla currently possesses and has not surrendered his voter's registration card from Puerto Rico is inconsequential because he has not voted in Puerto Rico after he left for Florida in December 31, 2004.  To the best of our knowledge, the Puerto Rico voter's registration cards do not expire and, although not used for voting purposes, may still be voluntarily used as a government issued identification card.

Ryan Padilla Mangual v. Pavia Hospital, et al
Civil No. 06-1115 (FAB)
Report and Recommendation
Page 16

claim of diversity.  Nonetheless, under the totality of circumstances, we cannot be blind-folded of Padilla's medical condition, psychological state and disability which impede him from working and making an income in the State of Florida.  It is a fact that, during the relevant period of time, Padilla did not work in Florida because he was, and still is, disabled.  He worked for some short periods of time but had to quit due to his depression.  As a consequence, Padilla did not, and still does not derive any income, reason for which he has never owned any properties in Florida, never has had any bank accounts, credit cards or ATM cards and has not filed any income tax returns there.

In addition, during the period at issue, Padilla did not go to school and did not belong to any church, clubs or other social organizations because he was bed ridden, in constant pain and sometimes aggressive due to his medical state and condition. To this effect, Freire and Padilla's mother had to take care of him during his first year in Florida in 2005.  Thus, these factors cannot be taken against Padilla's claim of diversity jurisdiction --under the totality of the circumstances-- because Padilla has not been able to take this affirmative steps because of his medical condition.

As stated by the Court of Appeals in its decision in this case of February 20, 2008:

In other words, the district court found that Padilla's declaration was not credible because he largely had not taken the affirmative steps described in Bank One, e.g. opening a bank account or obtaining an employment. **However, nothing we have said in our prior decisions implies that the typical indicia of domicile are required in order to change one's domicile; rather, we have described these as examples of indicia of intent**.  (Emphasis supplied).

Padilla-Mangual v. Pavía Hospital, No, 07-1447, p. 9.

In addition, as noted by the Court of Appeals:

It is certainly possible that one might change his residence with no intent of returning, but not make those connections described in Bank One.  Any number of explanations are possible –physical or mental incapacity, religious objections, to name a few. **The point is that where a party has declared his intent to change and remain in his new domicile, and the opposing written submissions do not demonstrate the falsity of the declaration with reasonable certainty, the absence of typical indicia of domicile is not determinative**.  (Emphasis supplied).

Padilla-Mangual v. Pavía Hospital, No, 07-1447, p. 11.

We find defendants' efforts to impeach plaintiff's testimonial and documentary evidence in cross-examination, as well as the documentary evidence submitted by defendants, do not demonstrate any falsity of the declaration of Padilla of his intent to change and remain indefinitely as a domicile of Florida, after he finished his treatment in 2005 in Jacksonville.[9]

In view of the foregoing, and after assessing the credibility of the witnesses and given the totality of the circumstances, we find Padilla has established by preponderance of the evidence his domicile in Florida for diversity purposes at the time of filing the instant case in federal court.

## CONCLUSION

Accordingly, it is recommended the defendants' request for dismissal for lack of diversity jurisdiction be DENIED and this court continues to exercises its jurisdiction over this case on diversity grounds.

IT IS SO RECOMMENDED.

---

[9] Defendants did not present any witnesses at the evidentiary hearing.

Ryan Padilla Mangual v. Pavia Hospital, et al
Civil No.  06-1115 (FAB)
Report and Recommendation
Page 18

The parties have ten (10) days to file any objections to this report and recommendation.  Failure to file same within the specified time waives the right to appeal this order.  Henley Drilling Co. v. McGee, 36 F.3d 143, 150-151 (1st Cir. 1994); United States v. Valencia, 792 F.2d 4 (1st Cir. 1986).  *See* Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 991 (1st Cir. 1988) ("Systemic efficiencies would be frustrated and the magistrate's role reduced to that a mere dress rehearser if a party were allowed to feint and weave at the initial hearing, and save its knockout punch for the second round").

IT IS SO ORDERED.

San Juan, Puerto Rico, this 22nd day  of  January of 2009.

s/CAMILLE L. VELEZ-RIVE
CAMILLE L. VELEZ-RIVE
UNITED STATES MAGISTRATE JUDGE